UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| In re ZUMIEZ INC. SECURITIES LITIGATION | Case No. C07-1980-JCC <br><br> <u>CLASS ACTION</u> |
| This Document Relates To: <br><br> ALL ACTIONS. | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |

This matter comes before the Court on Defendants' Motion to Dismiss Consolidated Amended Complaint (Dkt. No. 42), Plaintiffs' Response (Dkt. No. 47), and Defendants' Reply (Dkt. No. 49). Having thoroughly considered the parties' briefing and the relevant record, the Court finds that oral argument is unnecessary and hereby GRANTS Defendants' motion.

I.    **BACKGROUND**

A.    **The Company's Statements, Earnings, and Stock Prices in Fiscal 2007**

Zumiez Inc. ("Zumiez" or the "Company") runs a chain of mall-based retail stores that specialize in action sports related apparel, footwear, equipment and accessories. (Am. Compl. ¶ 2 (Dkt. No. 35 at 1).) The Company has pursued an aggressive growth strategy, increasing the number of stores by more than 20% per year, so that it was operating 235 stores by the end

of the 2006 fiscal year. (*Id.*; 3/14/07 Q4 2006 Conference Call 1 (Dkt. No. 44-2)[1].) The Company's growth strategy was very successful, and it increased earnings per share by 64% in 2004 ($0.17 to $.028), by 68% in 2005 ($0.28 to $0.47), and by 55.3% in 2006 ($0.47 to $0.73). (Am. Compl. ¶ 100 (Dkt. No. 35 at 34).)

On March 14, 2007, Zumiez announced record earnings for the fourth quarter of 2006 and made projections for the 2007 fiscal year. (3/14/07 Q4 2006 Conference Call 1 (Dkt. No. 44-2).) The Company reaffirmed its commitment to expanding its retail square footage by 20% per year and announced that it accordingly expected to open 50 new stores in 2007. (*Id.* at 2.) Zumiez expected its "comparable-store sales" (meaning the sales in stores that had been open for over one year) to continue to grow "in the mid-single digit range." (*Id.*) The company also projected total earnings per share of $0.94 to $0.96 in 2007, an increase of approximately 30% from 2006. (*Id.*) The Company announced that it expected this growth rate to be relatively uniform across the four quarters of 2007. (*Id.*) In response to this announcement, Zumiez's stock price increased from $36.21 on March 14, 2007, to $39.56 on March 15, 2007. (Am. Compl. ¶ 3 (Dkt. No. 35 at 2).)

On May 23, 2007, Zumiez announced its earnings for the first fiscal quarter of 2007, consisting of February, March, and April. (5/23/07 Q1 2007 Conference Call 1 (Dkt. No. 44-4).) Zumiez's Chief Executive Officer ("CEO"), Richard Brooks, announced that the company had opened 19 new stores during the quarter. (*Id.*) He reported that comparable-store sales had increased 11.3% as compared to the same quarter a year before, and that earnings per share for

---

[1] The Court takes judicial notice of the transcripts of the conference calls referenced in Plaintiffs' Consolidated Amended Complaint and the other statements that form the basis of Plaintiffs' claim. The Court generally considers these documents only for the fact that the statements were made; however, the Court also assumes the truth of certain uncontested facts. In particular, the Court assumes the truth of the Company's reported yearly, quarterly, and weekly earnings, which Plaintiffs do not contest; indeed, Plaintiffs extensively use the Company's reported earnings to support their claims. (*See, e.g.*, Am. Compl. ¶¶ 13, 16, 19, 20, 100, 103, 129, 131, 150 (Dkt. No. 35).)

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 2

the quarter had reached $0.06, a 50% increase from first quarter of 2006. (*Id.*) He announced

that he was "pleased with [the Company's] results for the first quarter and . . . remain[ed]

cautiously optimistic for the balance of the year," and reaffirmed the Company's projections

that the year's earnings per share would grow 30% from fiscal year 2006. (*Id.* at 2.) After the

announcement, Zumiez's stock price dropped somewhat to $38.92 on May 24, 2007. (Am.

Compl. ¶ 8 (Dkt. No. 35).)

The Company announced its second fiscal quarter earnings on August 22, 2007.

(8/22/07 Q2 2007 Conference Call 1 (Dkt. No. 44-6).) Brooks announced that the Company

had opened 12 new stores during the quarter and was on track to open all of its 50 new stores

before the Thanksgiving holiday. (*Id.*) Brooks reported comparable-store sales growth of

11.2%, 13.7%, and 9.7% for May, June, and July, respectively, and announced earnings per

share of $0.11 for the quarter, an 83% increase over the second quarter of 2006. (*Id.*) Zumiez's

Chief Financial Officer ("CFO"), Trevor Lang, announced that the Company was raising its

guidance for the 2007 fiscal year to project earnings per share of $0.97 to $0.99, an increase of

$0.03 from its previous projections. (*Id.*) This new projection corresponded to a 33% to 36%

growth over earnings in fiscal 2006. Around the time of this announcement, Zumiez's stock

price rose to $47.89. (Am. Compl. ¶ 10 (Dkt. No. 35).)

On October 18, 2007, Brooks and Lang presented at the Wachovia Consumer Growth

Conference. (10/18/07 Wachovia Presentation 1 (Dkt. No. 44-8).) Brooks reminded the

audience that the Company was "on track" to open "the 50 stores that were planned for this

year." (*Id.*) Brooks also announced that the Company was "on track again to grow earnings of

at least 30% this year." (*Id.*)

In addition to the quarterly conference call, the Company also held short calls to

announce monthly earnings. (11/07/07 Oct. 2007 Conference Call 1 (Dkt. No. 44-11).) On

November 7, 2007, Lang reported the Company's October earnings, including 5.1%

comparable-store sales growth for the month. (*Id.* (reporting weekly comparable-store sales

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

PAGE - 3

growth of 7.1%, 6.9%, 5.4% and 1.1% for each of the four weeks, in order).) The Company announced that it expected to report earnings per share of $0.27 to $0.28 in the third quarter, a growth of only 13% to 17% as compared to the same quarter in 2006. (*Id.*) Lang explained that this was below the Company's "internal projections, primarily due to the timing of certain nonequity incentive compensation accruals and, to a lesser extent, higher operational costs." (*Id.*) He then announced:

> We are taking a more conservative outlook for the remainder of fiscal 2007, due to the reliance on seasonal merchandise in the fourth quarter. We now expect full-year fiscal 2007 earnings per diluted share to be in the range of $0.92 to $0.94, compared to fiscal 2006 earnings of $0.73 per diluted share.

(*Id.*) This lowered projection corresponded to an earnings growth rate of 26% to 29%. In response, Zumiez's stock price dropped from $39.45 on November 7, 2007, to $26.13 on November 9, 2007. (Am. Compl. ¶ 13 (Dkt. No. 35).)

Three weeks later, on November 29, 2007, the Company officially announced its third quarter earnings. (11/29/07 Q3 2007 Conference Call 1 (Dkt. No. 44-15).) Zumiez CEO Brooks declared that the third quarter had been "solid," with comparable-store sales growth of 13.2% (17.4% for August, 13.9% for September, and 5.1% for October). (*Id.*) He explained that October comparable-store sales "were softer than prior months due to a slow start for winter related merchandise." (*Id.*) Brooks reported earnings per share of $0.28 for the quarter, on the high-end of the Company's guidance, and reiterated that several expenses had negatively impacted the bottom-line growth. (*Id.*) In particular, Zumiez CFO Lang reported that the expense increase primarily "was driven by a shift in the timing of our home office bonus accrual," but was also somewhat affected by increased "shrink and distribution expenses."[2] (*Id.* at 2; *see also id.* at 9.) Lang reiterated the Company's yearly earnings-per-share projection of $0.92 to $0.94, explaining that "[t]his assumes an upper single-digit

---

[2] According to the Complaint, "shrink" expenses are expenses related to theft. (Am. Compl. ¶ 99 (Dkt. No. 35 at 33).)

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 4

[comparable-store sales] increase for the fourth quarter." (*Id.* at 3.) Brooks also provided a preview of the month-to-date November comparable-store sales growth, noting that "through yesterday, [they were] in line with our earnings guidance." (*Id.* at 2.) He also explained: "We are particularly encouraged by our [comparable-store sales growth] over the Thanksgiving holiday weekend which was up in the mid-teens." (*Id.*) At the same time, in answering analysts' questions, both Brooks and Lang expressed concerns regarding winter-related merchandise. Brooks noted that weak winter-related sales were continuing into November, with comparable-store sales in that area about 5% behind the same time the previous year, and that the slower sales of winter-related merchandise were primarily in areas that had experienced unusually warm weather. (*Id.* at 3, 4, 7.) Brooks noted that when a late winter finally comes, there is generally a "pop in business" to capture the pent-up demand, but that "the later [the warm weather] goes, I think the less pent-up demand you capture" "because people just choose not to make the investment in new gear if the season's going to be really short." (*Id.* at 7–8.) He also said it was difficult to predict because "obviously, the macroenvironment I think at this point also affects that question as to how big of an increase you get if, when the snow hits." (*Id.* at 8.) In response to an analyst's question about whether there was any cushion in the Company's guidance in case of continued poor winter merchandise sales, Lang was optimistic that the company was "pretty well positioned from an inventory perspective" to reposition inventory and cancel orders before having to take large markdowns; however, Lang emphasized that "[t]he cold business in the fourth quarter really starting in October represents about 20% of our business" and concluded that "if winter just doesn't happen well then we're going to have a problem at this point that we would need to take a look at." (*Id.* at 5.)

Although Brooks had said that the November month-to-date comparable-store sales growth was in-line with the "upper single-digit" guidance for the fourth quarter, the November sales growth did not end up meeting these projections. On December 5, the Company

announced its complete November sales, and reported that after taking into account the last three days of the month, comparable-store sales had increased only 5.6% from November 2006. (12/05/07 Nov. 2007 Conference Call 1 (Dkt. No. 44-17).) Lang explained that the weekly comparable-store sale increases were 2.4%, 4.2%, 11.9%, and 2.5% for weeks 1–4, respectively. (*Id.*) In response to this announcement, Zumiez's stock price fell to $25.13 on December 6, 2007. (Am. Compl. ¶ 17 (Dkt. No. 35 at 8).)

Zumiez's December sales results turned out to be even worse. On January 7, 2008, the Company announced that comparable-store sales had increased only 3.9% in the five-week period ending January 5. (1/07/08 Dec. 2007 Conference Call 1 (Dkt. No. 44-19).) In the first three weeks of the period, comparable-store sales had actually decreased as compared to the year before. (*Id.* (reporting comparable-store sales growth of -1.2% in the first week, -1.8% in the second week, and -5.2% in the third week).) These sales bounced back in the last two weeks of the period (*id.* (reporting comparable-store sales growth of 23.5% in the fourth (Christmas) week and 16% in the fifth (New Year's) week)), but these gains were not enough to bring the monthly results close to the "upper single-digit" comparable-store sales growth that the Company had projected for the quarter. Based on the quarter-to-date sales results, the Company revised its projections for the full fiscal year down to earnings per share of $0.82 to $0.83, an overall growth rate of 12% to 15% over the past year's figures. (*Id.*) After the announcement, Zumiez's stock price fell to $16.31. (Am. Compl. ¶ 19 (Dkt. No. 35 at 8).)

On March 13, 2008, the Company announced earnings per share of $0.86, above its revised projections but still far short of its initial expectations. (3/13/08 Q4 2007 Conference Call 2 (Dkt. No. 44-21).) In the conference call, Brooks explained the difficulties of operating its mall-based retail stores in the downturned economic climate, noting that while some of the Zumiez's competitors were adopting a more promotional approach to boost short-term gains, the Company felt it would be imprudent to adopt a short-term strategy that could adversely impact its long-term earnings potential. (*Id.* at 1.) Instead, the Company had opted to continue

its growth-based strategy and to weather the economic downturn. (*Id.*) Lang acknowledged that there had been concern among analysts regarding the performance of the Company's newly opened stores, in particular because 20 of the 50 stores opened in 2007 were built in California, Arizona, Nevada, and Florida—all markets that were experiencing difficult operating environments. (*Id.* at 2.) Lang explained that new stores historically performed at about 70% of mature stores in terms of sales, and that the stores opened in 2005 and 2006 "came in at about" those volumes in their first full years of operations. (*Id.* at 2.) He reported that the class of 2007 stores was "currently trending below that average," and while it was difficult to accurately project sales because many of the new stores had not been open long, "the current expectation [was that] they would do just over 60% versus the historic levels [of] 70%." (*Id.* at 2, 6.) In response to an analyst's question, Lang explained that if you removed the new stores in California, Arizona, Nevada, and Florida from consideration, the percentage sales volumes became "substantially closer to that historic average of 70%," but that while "you get most of the way there[, y]ou're not going to be quite at 70%." (*Id.* at 6.) Lang also noted that the stores in these troubled states "were doing very well through back to school, and we believe the [new stores opened in 2007] will be fine once the econom[y] returns to more historic levels." (*Id.* at 2.)

### B.    Plaintiffs' Allegations of Wrongdoing

Plaintiffs bring this class action lawsuit on behalf of all persons who purchased Zumiez common stock between March 14, 2007, and January 4, 2008 (the "Class Period"), against the Company, Richard Brooks (Zumiez's CEO), Trevor Lang (Zumiez's CFO), and Thomas Campion (Zumiez's co-founder and Chairman of the Board). (Am. Compl. ¶ 1 (Dkt. No. 35 at 1).) Plaintiffs allege that Defendants engaged in a scheme to defraud shareholders by making materially false and misleading statements and engaging in insider trading. (*Id.* ¶ 175–87.)

Plaintiffs allege that the Company was suffering from serious internal problems, that it was expanding too fast to hire and retain quality employees (*see id.* ¶¶ 35, 38, 41, 50), that

certain types of merchandise were underperforming (*see id.* ¶¶ 43, 54), that stores often had shortages and inventory problems (*see id.* ¶¶ 34, 47), and that "shrink" (i.e., theft of merchandise) was a common problem (*see id.* ¶¶ 39, 51). Plaintiffs claim that these problems contributed to decreased sales, particularly at Zumiez's newly-opened stores, many of which were in new markets or in markets heavily affected by the economic downturn. (*See id.* ¶¶ 5, 85.) Plaintiffs assert that, in light of these alleged company-wide problems, Zumiez's earnings projections were unreasonable. (*See id.* ¶¶ 4, 14.)

Specifically, Plaintiffs challenge six different statements as false or misleading. First, they claim that, on March 14, 2007, Zumiez had no reasonable basis to introduce its initial guidance for fiscal 2007 of $0.94 to $0.96 in earnings per share, and the Individual Defendants knew that, in light of the alleged problems, actual earnings would be lower than projected. (*See id.* ¶¶ 76–102.) Second, they claim that, for the same reasons, the Company had no reasonable basis for reaffirming its guidance on May 23, 2007. (*See id.* ¶¶ 103–13.) Third, Plaintiffs allege that Zumiez had no reasonable basis to raise the earnings-per-share guidance on August 22, 2007, to $0.96 to $0.99, and that these increased projections resulted purely from pressure to maintain a high stock price. (*See id.* ¶¶ 114–23.) Fourth, Plaintiffs claim that it was false and misleading for Brooks to assert on October 18, 2007, that the Company was "on track again to grow earnings of at least 30% this year." (*See id.* ¶¶ 124–33.) Fifth, Plaintiffs allege that the Company had no reasonable basis for lowering its guidance down to $0.92–$0.94 on November 7, 2007, because the Individual Defendants knew that even these reduced projections were unrealistically optimistic. (*See id.* ¶¶ 134–40.) Finally, Plaintiffs allege that the Company had no reasonable basis for reaffirming this guidance on November 29, 2007, and that it was false and misleading for Brooks to claim that the November month-to-date comparable-store sales growth was in line with the "upper single-digit" rate that the Company had projected for the fourth quarter. (*See id.* ¶¶ 141–50.)

Defendants move to dismiss, arguing that Plaintiffs have failed to satisfy the "exacting pleading requirements" for securities fraud complaints set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007).

## II.    DISCUSSION

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 74u-4(b)(1); *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). The complaint must also, "with respect to each act or omission . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 74u-4(b)(2). The "required state of mind" depends on whether or not the statement is "forward-looking." For forward-looking statements, Plaintiffs must state facts giving rise to a strong inference that Defendants had "actual knowledge . . . that the statement was false or misleading." *Id.* § 74u-5(c)(1)(B); *Ronconi*, 253 F.3d at 429; *see also Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996) (holding that a financial forecast is "false or misleading" "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy"); *In re Apple Computer Inc.*, 127 F. App'x 296, 300 (2005) (unpublished) (stating that a revenue projection is not actionable unless the speaker "knew th[e] revenue target was unattainable when made"). For non-forward-looking statements, the complaint "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 974 (9th Cir. 1999); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). Under either standard of scienter, a "strong inference" is an inference that, when considering the complaint

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 9

1    in its entirety, is "'*cogent and at least as compelling as any opposing inference* one could draw

2    from the facts alleged.'" *Zucco*, 552 F.3d at 991 (emphasis in original) (*quoting Tellabs*, 127 S.

3    Ct. at 2509). Because "falsity and scienter in private securities fraud cases are generally

4    strongly inferred from the same set of facts," the requirement that the complaint plead a

5    "strong inference" of scienter correspondingly results in a stricter standard for pleading falsity;

6    as a result, courts in the Ninth Circuit generally combine the two analyses into a "unitary

7    inquiry." *Ronconi*, 253 F.3d at 429; *see also In re Daou Systems Inc. Securities Litigation*, 411

8    F.3d 1006, 1016 (2005); *In re Vantive Corp. Securities Litigation*, 283 F.3d 1079, 1091 (2002).

9          As an initial matter, it is important to note that, at least on the surface, the Company's

10   various projections over the course of the 2007 fiscal year appear perfectly reasonable and

11   consistent with prior performance. On March 14, 2007, Zumiez announced record earnings for

12   the fourth quarter of 2006 and projected that in 2007 earnings per share would grow

13   approximately 30%, a relatively conservative estimate considering that the company had

14   averaged over 60% growth in the previous three fiscal years. (Am. Compl. ¶¶ 3, 100.) The

15   Company explained that it expected this growth to be distributed relatively evenly over the

16   four quarters and that it expected comparable-store sales to grow "in the mid-single digit

17   range." (3/14/07 Q4 2006 Conference Call 2 (Dkt. No. 44-2).) In the first quarter, Zumiez

18   reported earnings per share growth of 50% and comparable-store sales growth of 11.3%,

19   beating both of its initial projections and suggesting that its original guidance, which it

20   reaffirmed, was not unreasonable. (*See* 5/23/07 Q1 2007 Conference Call 1–2 (Dkt. No. 44-4).)

21   The Company similarly outperformed its expectations in the second fiscal quarter, with

22   earnings per share increasing 83% over the previous year and comparable-store sales growing

23   11.6%. (8/22/07 Q2 2007 Conference Call 1 (Dkt. No. 44-6).) After announcing this

24   unexpectedly favorable performance, the Company raised its guidance to project earnings-per-

25   share growth of approximately 33% to 36% for the fiscal year, (*id.* at 2) still relatively

26   conservative in light of its growth in prior years and over the first half of 2007. The third

quarter started strong, with comparable-store sales growth of 17.4% in August and 13.9% in September, but sales began to drop off in October, with comparable-stores sales increasing 7.1% in the first week, 6.9% in the second, 5.4% in the third, and only 1.1% in the fourth. (11/29/07 Q3 2007 Conference Call 1 (Dkt. No. 44-15); 11/7/07 Oct. 2007 Conference Call 1 (Dkt. No. 44-11).) Midway through October, before the bulk of the decline, Brooks announced at the Wachovia conference that the Company was "on track again to grow earnings of at least 30% this year," already somewhat less optimistic than the Company's previous projection. (10/18/07 Wachovia Presentation 1 (Dkt. No. 44-8).) After witnessing poor performance in the end of October and beginning of November, Zumiez promptly lowered its guidance on November 7, 2007, projecting earnings per share to grow only 26% to 29% over the course of the fiscal year. (11/7/07 Oct. 2007 Conference Call 1 (Dkt. No. 44-11).) The Company reaffirmed this guidance on November 29, 2007, in part based on its strong performance over Thanksgiving weekend, (11/29/07 Q3 2007 Conference Call 1 (Dkt. No. 44-15), but then lowered its guidance further on January 7, 2008, after seeing poor performance in late November and dismal performance in early December, (1/07/08 Dec. 2007 Conference Call 1 (Dkt. No. 44-19)). At the end of the fiscal year, the Company finally reported earnings that slightly exceeded these final projections. (3/13/08 Q4 2007 Conference Call 2 (Dkt. No. 44-21).)

To survive the exacting requirements of the PSLRA, Plaintiffs must plead, with sufficiently particularity, facts that raise a strong inference that Defendants made false or misleading statements with at least deliberate recklessness. *See Vantive*, 283 F.3d at 1085. In other words, Plaintiffs must plead particular facts that, if believed, would raise an inference of fraud "at least as strong as any opposing inference," *Tellabs*, 127 S. Ct. at 2511, including the relatively straightforward interpretation that the Company's projections were honest and reasonable attempts to predict performance, adjusted at various points over the course of the fiscal year based on the Company's actual performance in changing market conditions.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 11

One obvious difficulty with Plaintiffs' theory is that, from March until mid-October, Zumiez not only met, but significantly exceeded, its prediction of "mid-single digit" comparable-store sales growth. (*See* 5/23/07 Q1 2007 Conference Call 1–2 (Dkt. No. 44-4); 8/22/07 Q2 2007 Conference Call 1 (Dkt. No. 44-6); 11/29/07 Q3 2007 Conference Call 1 (Dkt. No. 44-15); 11/7/07 Oct. 2007 Conference Call 1 (Dkt. No. 44-11).) Similarly, the Company far exceeded its projected 30% growth in earnings per share in both of the first two fiscal quarters. (*See* 5/23/07 Q1 2007 Conference Call 1–2 (Dkt. No. 44-4); 8/22/07 Q2 2007 Conference Call 1 (Dkt. No. 44-6).) Therefore, to raise a credible inference that the Company's predictions during this time period were false or misleading, Plaintiffs must allege facts to suggest not only that Defendants knew of undisclosed problems within the company, but that these known problems (1) would somehow not manifest a negative effect on earnings until the later quarters, and (2) were not taken into account when calculating the Company's projected earnings. Plaintiffs allege hardly *any* such facts, much less facts sufficient to raise a *strong* inference of wrongdoing.

### A. Forward-Looking Earnings Projections

Plaintiffs claim that five of Zumiez's earnings projections in 2007—issued on March 14, May 23, August 22, November 7, and November 29—were false or misleading. These various projections were undoubtedly forward-looking. *See* 15 U.S.C. § 78u-5(i)(1) (defining "forward-looking statement" to include "a statement containing a projection of revenues, income . . . , earnings . . . , or other financial items"). Therefore, to survive the exacting pleading requirement of the PSLRA, Plaintiffs must plead particular facts sufficient to raise a strong inference that Defendants made these projections with actual knowledge that they lacked any reasonable basis in fact. *Provenz*, 102 F.3d at 1487.

The Court finds that Plaintiffs have failed to plead their allegations with sufficient particularity and have failed to raise a strong inference that Defendants made their earnings

projections with actual knowledge that they were false or misleading.[3] Indeed, the flaws in Plaintiffs' complaint are legion, and the allegations fail on several levels. First, Plaintiffs rely primarily on eleven confidential witnesses, most, if not all, of whom were in no position to have information concerning company-wide performance. Second, Plaintiffs attempt to use Defendants' own statements against them, but in so doing they blatantly misrepresent these statements and take them completely out of context. Third, Plaintiffs make hardly any allegations about the timing of the alleged problems, so one has no way of knowing if they existed during the class period and, if so, for which portions. Fourth, even if the company was facing operational difficulties at the time the various statements were made, Plaintiffs fail to allege sufficient facts to suggest that these difficulties were not factored into the analysis that the Company used to generate its stated projections. Finally, Plaintiffs attempt to rely on certain of the Defendants' stock sales to infer scienter, but they allege no specific facts to suggest that these stock sales were unusual or suspicious.

### 1. Confidential Witnesses

Plaintiffs rely primarily on allegations made by eleven confidential witnesses ("CWs"). (*See* Am. Compl. ¶¶ 32–65 (Dkt. No. 35 at 11–19).) In the Ninth Circuit, "a complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995.

> First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.

*Id.*

---

[3] Because the Court finds that the Complaint lacks the particularity to infer falsity or scienter, it does not consider Defendants' argument that the forward-looking statements were accompanied by sufficient cautionary language to invoke the PSLRA's "Safe Harbor" provisions under 15 U.S.C. § 78u-5(c)(1)(A). (*See* Mot. 12–17 (Dkt. No. 42).)

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 13

In this case, all eleven confidential witnesses are identified as former Zumiez employees who either resigned or were terminated before the end of the Class Period. (Am. Compl. ¶¶ 33, 34, 36, 40, 42, 44, 50, 52, 55, 59, 61 (Dkt. No. 35).) CW3 and CW8 served as assistant store managers; CW1, CW2, CW4, CW5, CW6, and CW11 were full store managers; and CW7, CW9, and CW10 each oversaw three or four stores. (*Id.*) Both CW2 and CW8 appear to have left the Company before the Class Period even began. (*Id.* ¶¶ 34, 52.)

Many of the confidential witnesses make broad statements about the health of the Company, but the Complaint fails to allege specific facts "to establish their reliability and personal knowledge" regarding this Company-wide information. For example, many of the witnesses make broad allegations that Zumiez was expanding too fast and could not hire or retain sufficiently experienced employees. (*See, e.g.*, *id.* ¶ 35 ("CW2 . . . stated that Zumiez was expanding too rapidly and that everyone knew it."); *id.* ¶ 38 ("CW3 stated Zumiez did not have enough experienced employees to expand as fast as the Company did."); *id.* ¶ 41; *id.* ¶ 49; *id.* ¶ 50). Some witnesses claimed that sales were faltering Company-wide (*id.* ¶¶ 33, 59), others claimed that newly opened stores failed to meet sales goals (*id.* ¶ 59), and yet others claimed that certain markets were doing especially poorly (*id.* ¶ 34 (Northwest and Arizona)). Most of these allegations are made without setting forth the basis for the opinions or providing any facts to suggest that the witnesses were positioned to accurately assess the Company's performance on such a broad scale. Several of the allegations are explicitly based on unreliable hearsay. (*See id.* ¶ 34 ("[A]fter resigning in March 2007, former colleagues told CW2 that markets in the Northwest and Arizona were down in 2007."); *id.* ¶ 34 ("[D]istrict managers told CW10 that Company-wide sales were not great.").) CW9 broadly claims that "Company-wide sales were discussed at meetings attended by store managers, district managers, Brooks and Campion" (*id.* ¶ 56), but this is uncorroborated by the other witnesses and the Complaint gives no indication as to which of CW9's sweeping statements comes from information obtained at these meetings. Because the Complaint fails to plead with particularity facts to

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 14

indicate that these statements are reliable and based on the witnesses' personal knowledge, the Court finds that these broad allegations do not support inferences of either falsity or scienter. *Zucco*, 552 F.3d at 996.

The confidential witnesses also make certain anecdotal statements regarding the performance of their own stores. (*See, e.g.*, *id.* ¶ 37 ("CW3 recalled several instances, in which the Portland store did not reach the sales goals included in the morning e-mail and that there were days when sales were substantially less than the goal."); *id.* ¶ 62 ("CW11 said that sales at the Garland store failed to meet projections in 2007, and were way below expectations.").) Given the witnesses' positions at these stores, the Court finds that these allegations are pled with sufficient indicia of reliability. However, these statements hardly raise an inference that the alleged problems were widespread throughout the Company. By the end of 2007, Zumiez operated 285 stores across the country (*see id.* ¶ 2); it is hardly surprising that some of these stores suffered operational difficulties. That Plaintiffs were able to find a dozen managers whose stores underperformed expectations does little, if anything, to support their broader allegations.

### 2.    Timing of the Alleged Problems

Even if the Court were to fully credit each of the CWs' broad, unreliable allegations of Company-wide difficulty and poor performance in specific segments, the witnesses provide little to no indication as to when these problems occurred. Instead, employees who allegedly worked at the Company for years make broad, unspecific allegations: "Zumiez had problems with loss prevention and shrink" (*id.* ¶ 39); "CW6 said there were problems receiving inventory from corporate " (*id.* ¶ 47); "CW9 said it was very rare for new stores to meet sales goals" (*id.* ¶ 56). These problems are not alleged to have occurred at any specific time, and so they cannot suggest an inference that any individual statement was unreasonable.

Plaintiffs similarly point to problems that the Company admittedly faced at the *end* of the 2007 fiscal year and unreasonably assume that these same problems existed over the course

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 15

of the entire year. For example, on March 13, 2008, when the Company finally announced its earnings for the 2007 fiscal year, Zumiez CFO Lang noted that new stores had historically performed at about 70% of mature stores but that the batch of stores opened in 2007 were "*currently* trending below that average." (3/13/08 Q4 2007 Conference Call 2 (Dkt. No. 44-21) (emphasis added).) He explained that it was difficult to project how these stores would perform because many had not been open long, but projected that "the *current* expectation [was that] they would do just over 60% versus the historic levels [of] 70%." (*Id.* at 6 (emphasis added).) Lang explained that the new stores were underperforming in large part because 40% were located in California, Arizona, Nevada, and Florida, which had become particularly "difficult operating environments." (*Id.* at 2.) He explained, however, that stores in those markets had been extremely productive for the Company in the past and "were doing very well through back to school," so he expressed confidence that the sales at these new stores would eventually return to more historic levels. (*Id.*) Plaintiffs cherry-pick Lang's statements and try to characterize them as evidence that the newly opened stores were performing at only 60% of mature stores *throughout the entire Class Period* and that the operating environments in these core markets were "difficult" throughout this entire period as well. (*See* Am. Compl. ¶ 110 ("[D]efendants knew there was no reasonable basis for the [May 23, 2007] guidance because . . . they knew . . . sales from stores opened in 2007 were just 60% of sales at mature stores . . . ; 30% of the Company's stores were located in California, Arizona, Nevada, and Florida— markets with difficult operating environments due to the slowing economy; [and] 40% of the 50 stores opened in 2007 were located in these reeling markets.").) Yet Lang's statements clearly were describing the state of affairs *in March of 2008*, not during the class period; indeed, he specifically stated that the now-depressed markets had been "doing very well through back to school" (presumably sometime in September 2007). Plaintiffs fail to allege any facts—other than the blanket, overbroad, and unreliable assertions of its confidential

witnesses—for inferring that the problems the Company faced at the end of the fiscal year also affected it during in the early stages of the Class Period.

### 3. Evidence that the Problems Were Worsening

As described above, in order to be even remotely credible, Plaintiffs' theory of the fraud must somehow account for the Company's better-than-projected earnings in the first two quarters. (*See* 5/23/07 Q1 2007 Conference Call 1–2 (Dkt. No. 44-4); 8/22/07 Q2 2007 Conference Call 1 (Dkt. No. 44-6).) Therefore, even if the Court accepted Plaintiffs' unsupported allegations that the Company faced large operational problems during the Class Period, that would still not suggest that Defendants' projections were misleading or raise the requisite strong inference of scienter. Instead, Plaintiffs must plead with particularity facts demonstrating not only that the Company faced problems, but also that Defendants *knew* these problems would *worsen* over the course of the fiscal year.

Only one of Plaintiffs' allegations even arguably attempts to raise such an inference. Specifically, Plaintiffs claim that the stores that had opened in 2006 were underperforming as compared to the older stores; therefore, Defendants knew that comparable-store sales growth would decrease over the course of the year as these underperforming stores entered the comparable-store sales base (i.e., stores open more than one year). (Am. Compl. ¶ 6 (Dkt. No. 35 at 3).) This could arguably explain how Defendants' projected earnings for the year might be unreasonable even though the Company consistently outperformed its projected comparable-store sales growth through mid-October. (*See* 5/23/07 Q1 2007 Conference Call 1–2 (Dkt. No. 44-4); 8/22/07 Q2 2007 Conference Call 1 (Dkt. No. 44-6); 11/29/07 Q3 2007 Conference Call 1 (Dkt. No. 44-15); 11/7/07 Oct. 2007 Conference Call 1 (Dkt. No. 44-11).)

Plaintiffs' allegations are unsuccessful, however, because they have failed to plead with sufficient particularity any facts to suggest that the Company's 2006 stores were actually growing more slowly than its older stores had been growing when they were first incorporated into the comparable-store sales base. On March 13, 2008, Lang explained that new stores historically generated 70% of mature store sales in their first year, and stated the "first full year of sales [for the stores opened in 2005 and 2006] came in at about 70% of our mature store volumes." (3/13/08 Q4 2007 Conference Call 2, 6 (Dkt. No. 44-21).) Plaintiffs somewhat mysteriously interpret this statement as a concession that "sales from the 62 stores opened in 2006 were *less* than 70% of sales at mature stores." (*Id.*) This appears to be nothing but a blatant misrepresentation of Lang's statement, which clearly does not support the inference that Plaintiffs would draw.

Plaintiffs also note that several of the stores opened in 2006 were in "non-core" markets (i.e., markets where Zumiez had not already established a presence). (Am. Compl. ¶ 85 (Dkt. No. 35).) On March 13, 2008, Brooks explained that these stores typically take three years before they perform at their "peak level" (3/13/08 Q4 2007 Conference Call 7 (Dkt. No. 44-21)), so Plaintiffs claim that Defendants knew the 2006 stores would underperform as compared to the previous years (Am. Compl. ¶ 85 (Dkt. No. 35)). However, while the Complaint alleges how many of the 2006 and 2007 stores were in "non-core" markets, it fails to allege the percentage of stores in prior years that were in "non-core" markets. As a result, Plaintiffs' allegation fails to raise any inference that the 2006 stores would be expected to perform any worse than prior years.

Finally, even if the Complaint had successfully alleged that the 2006 stores were underperforming relative to their predecessors, it would only marginally support Plaintiffs' claims. That fact could explain why the various problems that Plaintiffs have alleged did not initially result in lower comparable-store sales growth (because the 2006 stores were not yet considered "comparable stores"); however, it would not explain why these problems did not

negatively impact the Company's *earnings*. As described above, Zumiez soundly beat its earnings projections in both the first and second quarter (*see* 5/23/07 Q1 2007 Conference Call 1–2 (Dkt. No. 44-4); 8/22/07 Q2 2007 Conference Call 1 (Dkt. No. 44-6)), so it is difficult to see how the Company's initial projections lacked any reasonable basis.

### 4. Evidence that the Alleged Problems Were Not Considered

Finally, even if Plaintiffs had successfully pled facts to support their allegations that the Company was suffering from serious problems during the Class Period that would have had a foreseeable negative effect on earnings in the later part of the year, nothing in the Complaint suggests that Defendants did not take such problems into account when generating the Company's projections. When viewed in comparison to its past performance, Zumiez's guidance for the 2007 fiscal year appears quite conservative. (*See* Am. Compl. ¶ 100 (Dkt. No. 35 at 34).) The Company projected earnings per share to grow at 30%, whereas it had grown 64.7%, 67.8%, and 55.3% in 2004, 2005, and 2006, respectively. (*Id.*) Therefore, even if Defendants had foreseen certain problems that could have negatively affected the late-year earnings, nothing suggests that they did not factor those considerations into their calculations.

Plaintiffs allege that Defendants knew the Company could meet its initial projections only if the new stores opened in 2006 and 2007 exceeded 70%–75% of net sales at the "mature" stores. (*Id.* ¶ 4.) Indeed, the Complaint specifically alleges that on November 7, 2007, "defendants revealed *for the first time* that the $0.97–$0.99 guidance for 2007 diluted [earnings per share] assumed an improvement in new store productivity (i.e., net sales) above historical 70%–75% run rates . . . ." (*Id.* ¶ 13 (emphasis in original).) The Court has thoroughly reviewed the Company's public statements on November 7, 2007, and they do not appear to contain any such revelation. (*See, e.g.*, 11/7/07 Oct. 2007 Conference Call (Dkt. No. 44-11).) Instead,

Plaintiffs appear to be relying on the statements of two *analysts*, who allegedly claimed that the Company's forecasting model called for new store productivity above the historical 70% rate. (Am. Compl. ¶ 79 (Dkt. No. 35 at 24–25).) The Complaint does not quote these analysts directly, nor does it allege any facts to suggest the basis for their beliefs. The Court finds that this unsupported assertion does not come close to the level of particularity required by the PSLRA. 15 U.S.C. § 74u-4(b)(1); *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

\* \* \*

In sum, Plaintiffs allege that Defendants had no reasonable basis for making their various forward-looking earnings projections from March 14, 2007, until November 29, 2007, in light of various alleged problems within the Company that made such projections unattainable. (*See* Response 5 (Dkt. No. 47).) However, the Complaint fails to sufficiently plead facts to suggest: (1) that such problems actually existed on a scale sufficient to affect the Company; (2) that they actually existed during the Class Period; (3) that they were likely to negatively affect late-year earnings despite strong early-year reported earnings; or (4) that they were not considered by Defendants when formulating the Company's projections. Accordingly, the Court finds that Plaintiffs have completely failed to raise a "strong inference" that Defendants knowingly made false or misleading earnings projections. *See Vantive*, 283 F.3d at 1085.

**B.      Non-Forward-Looking Statements about Current Performance**

Plaintiffs also challenge two statements that could arguably be viewed as assertions regarding current business performance, rather than forward-looking statements: (1) Brooks's October 18, 2007, statement that the Company was "on track" to grow earnings by at least 30%, and (2) Brooks's November 29, 2007, statement that the Company's month-to-date comparable-store sales growth were in line with its fourth quarter projections. To the extent that these statements are not forward-looking, they are actionable if Plaintiffs allege specific

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 20

facts sufficient to raise a strong inference that Brooks made the statements with deliberate recklessness to investors. *Id.*

### 1. 10/18/07 Statement that Zumiez was "On Track" for 30% Growth

In challenging Brooks's mid-October statement that the Company was "on track again to grow earnings of at least 30% this year," Plaintiffs restate many of the same allegations they used to challenge the earnings projections, arguing again that problems within the Company undermined any reasonable basis for the 30% growth prediction. (Am. Compl. ¶ 125–30 (Dkt. No. 35 at 43–45).) The Court finds these allegations insufficiently pled for the same reasons they were insufficiently pled as to the earnings projections.

The Complaint further alleges that Brooks must have known that the Company was not on track to grow earnings by 30% because, three weeks later, on November 7, the Company revised its guidance downward to project only 26% to 29% growth for the fiscal year. (*See* 11/7/07 Oct. 2007 Conference Call (Dkt. No. 44-11) (announcing expected "full-year fiscal 2007 earnings per diluted share to be in the range of $0.92 to $0.94, compared to fiscal 2006 earnings of $0.73 per diluted share.").) The Complaint alleges that Defendants "knew by October 18, 2007, that comparable-store sales growth had declined in the first three weeks of October," citing the Company's reported figures. (Am. Compl. ¶ 131 (Dkt No. 131).) Yet these exact figures undermine any suggestion of wrongdoing. As Plaintiffs allege, comparable-store sales growth declined consistently over the four-week period ending October 30, 2007, from 7.1% to 6.9% to 5.4% to 1.1%. (*Id.*) On October 18, Brooks would have only had the data from the first two weeks, and, although the comparable-store sales growth was lower than it had been in the earlier part of the year, it was still well within the "mid-single digit" range that the Company had first projected in March when it announced 30% expected growth in earnings per share. (*See* 3/14/07 Q4 2006 Conference Call 2 (Dkt. No. 44-2).) In contrast, by November 7, the Company would have seen not only the weak 1.1% growth in the last week of October, but also a similarly disappointing 2.4% growth in the first week of November. (*See* 12/5/07

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 21

Nov. 2007 Conference Call 1 (Dkt. No. 44-17).) Given the drop-off in earnings growth between October 18 and November 7, it is unsurprising that the Company took a more conservative outlook on the later date. Therefore, the Court finds that the close timing between these two statements does not raise a strong inference that Brooks's statement on October 18 was made with deliberate recklessness to investors. *See Vantive*, 283 F.3d at 1085.

> ## 2. 11/29/07 Statement that November Month-to-Date Comparable-Store Sales Growth was in the "Upper Single-Digits"

Plaintiffs also challenge Brooks's statement regarding the November month-to-date comparable-store sales growth, again using Zumiez's own reported earnings to suggest that the statement could not have been true. The Complaint alleges that the Company could not have been tracking "upper single-digit" growth on November 29, 2007, when the Company ended up reporting only 5.6% growth for the four-week period ending December 1. (Am. Compl. ¶ 150–51 (Dkt. No. 35 at 51–52).)

Zumiez reported that comparable-store sales grew as compared to the previous year 2.4% in the first week of November, 4.2% in the second week, 11.9% in the third (Thanksgiving) week, and 2.1% in the fourth week. (*Id.* ¶ 151.) On November 29, 2007, Defendants would have had the data from the first three weeks and from the beginning of the last week. Plaintiffs claim that given the growth rates in the first three weeks, the Company would have needed double-digit growth in the final week to achieve "upper single-digit" growth for the month overall. (Response 19–20 (Dkt. No. 47).) In making this allegation, however, Plaintiffs misunderstand that growth over the course of a month is a *weighted* average of the weekly growth rates—10% growth in a week that had very high sales the previous year will contribute much more to the monthly growth rate than would 10% growth in a lower-volume week. (*See* Mot. 23 (Dkt. No. 42).) Without any facts alleging the relative

sales volumes of each of the weeks in November, one cannot evaluate how strong an inference to draw from the first three weeks of data. Accordingly, the Court finds that Plaintiffs have failed to plead with particularity grounds for inferring that the November 29 statement was false or misleading.

Indeed, common knowledge strongly suggests that the weeks before and after Thanksgiving weekend would have much higher sales volumes than the first two weeks of the month, so the monthly growth rate would in fact be heavily influenced by the growth at the end of the month. Given that the Company reported comparable-store sales growth in the "mid-teens" over Thanksgiving weekend, (*see* Am. Compl. ¶ 142 (Dkt. No. 35 at 49)), it seems quite likely that the Company was in fact tracking "upper single-digit" growth when Brooks made the statement, only to have the growth rate drop after the poor performance in the last week of the month. Plaintiffs have failed to state with particularity facts giving rise to a strong inference (i.e., an inference at least as strong as any opposing inference) that Brooks's statement was made with deliberate recklessness to investors. *Tellabs*, 127 S. Ct. at 2511; *Vantive*, 283 F.3d at 1085.

### C. Stock Sales

Finally, Plaintiffs allege that certain stock trades by Individual Defendants are indicative that their statements were false and misleading and part of a fraud to deceive the shareholders. (*See* Am. Compl. ¶ 11 (Dkt. No. 35 at 5).) The Ninth Circuit allows stock sales to be used as circumstantial evidence of falsity or scienter, but only when such sales are "unusual" or "suspicious." *Ronconi*, 253 F.3d at 435. "Insider trading is suspicious only when it is dramatically out of line *with prior trading practices* at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986 (emphasis added) (internal quotation omitted). "Among the relevant factors to consider are: (1) the amount and *percentage of shares* sold by insiders; (2) the timing of the sales; and (3)

whether the sales were consistent with the insider's *prior trading history*." *Id.* (emphasis added).

Here, the Complaint utterly fails to allege any facts about the Defendants "prior trading history" and hence makes no attempt whatsoever to demonstrate that trades were "dramatically out of line with prior trading practices." (*See* Am. Compl. ¶¶ 122–23 (Dkt. No. 35 at 42).) The Complaint similarly makes no allegations as to the percentage of shares sold. (*Id.*) The Ninth Circuit has recently made clear that without an "allegation . . . that . . . stock sales, though significant, are inconsistent with . . . usual trading patterns, no inference of scienter can be gleaned from [the] stock sale assertions." *Zucco*, 552 F.3d 1006. Accordingly, the Court gleans no inferences from Plaintiffs' stock sale assertions.

### E.     Plaintiffs' Allegations as a Collective

The Supreme Court and the Ninth Circuit have both emphasized that a court must "'consider the complaint in its entirety' to determine whether '*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter.'" *Id.* (*quoting Tellabs*, 127 S. Ct. at 2509). Considering all of the facts alleged as a collective, the Court finds that the Complaint fails to raise a strong inference that Defendants made false or misleading statements with actual knowledge or deliberate recklessness; indeed, it fails by quite a large margin. In their sixty-four-page Complaint, Plaintiffs make numerous allegations of problems within the Company. Most of the allegations are vague, overbroad, and based on the statements of confidential witnesses who would have no reason to possess such information. But even if the allegations were true, and the Company was faced with significant problems, "[m]uch of any business consists of having problems and dealing with them." *Ronconi*, 253 F.3d at 430. As in *Ronconi*, "[t]here is nothing in [Plaintiffs' alleged] problems . . . that suggests intentional or deliberately reckless falsity or deception in the [Company's] statements." *Id.* Accordingly, Defendants' motion to dismiss must be granted.

### F.     Futility of Amendment

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PAGE - 24

In the alternative, Plaintiffs request leave to amend the Complaint. Although "leave to amend is to be freely granted when justice so requires," *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (*citing* FED. R. CIV. P. 15(a)), leave may be denied when amendment would be futile. *Zucco*, 552 F.3d at 1007; *Lipton*, 284 F.3d at 1039; *Silicon Graphics*, 183 F.3d at 991.

The Court finds that, in this case, amendment would be futile. The Complaint has previously been amended, and Plaintiffs have alleged no facts beyond the Complaint that would further support an inference that Defendants made false or misleading statements with the requisite scienter. As the Court has described in detail, the Complaint is flawed on every level, reflecting a fundamentally misguided theory of the case. Indeed, this action appears to be the very sort of "fishing expedition" that the PSLRA was designed to deter. *See Silicon Graphics*, 183 F.3d at 998. Having failed to suggest *any* reasonable inference of wrongdoing on the part of Defendants, the Court finds that it would frustrate the purpose of the PSLRA to grant Plaintiffs leave to amend. *See Tellabs*, 127 S. Ct. at 2504 ("Private securities fraud actions . . . , if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whole conduct conforms to the law.").

## III.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Dkt. No. 42) is GRANTED. The Consolidated Amended Complaint (Dkt. No. 35) is DISMISSED with prejudice.

SO ORDERED this 30th day of March, 2009.

John C. Coughenour
United States District Judge